GONZALEZ & LEIGH, LLP
MATT GONZALEZ (SBN 153486)
G. WHITNEY LEIGH (SBN 153457)
MATTHEW R. SCHULTZ (220641)
MATT SPRINGMAN (SBN 252508)
Two Shaw Alley, Third Floor
San Francisco, CA 94105
Telephone: (415) 512-2000
Facsimile: (415) 512-2001

Attorneys for Defendant
SUSAN POLGAR

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA CHESS FEDERATION, INC., an Illinois not-for-profit corporation, RANDALL D. HOUGH, an individual,<br><br>               Plaintiffs,<br><br>     v.<br><br>SUSAN POLGAR, an individual, GREGORY ALEXANDER, an individual DOES 1-10, inclusive<br><br>               Defendants. | Case No. 3:08-cv-05126-MHP<br><br>**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE**<br><br>Hearing Date:  September 14, 2009<br>Time:         2:00 p.m.<br>Courtroom:   15, 18th Floor<br>Judge:       Hon. Marilyn Hall Patel |

1

# TABLE OF CONTENTS

2

Page

3      I.   INTRODUCTION..................................................................................................1

4      II.  FACTS AND RELEVANT PROCEDURAL HISTORY .........................................3

5      III. LEGAL STANDARD .........................................................................................10

6      IV.  ARGUMENT .....................................................................................................11

7           A.  Plaintiffs Produced Their Communications WIth Karl
               Kronenberger To Ms. Polgar Without Objection Or Reservation...................11
8
            B.  Plaintiffs Failed To Use "All Reasonable Means" To Protect The
9               Confidentiality Of Their Communications With Mr.
               Kronenberger When They Allowed Them To Be Available To
10              The Public For Over Ten Months (And Counting) ........................................12

11          C.  Plaintiffs Failed To Use "All Reasonable Means" To Protect The
               Confidentiality Of Their Communications With Mr.
12              Kronenberger After Polger Informed Them That These
               Communications Were Available To the Public ...........................................14
13
            D.  Plaintiffs Have Admitted To Repeatedly Disclosing Their
14              Communications With Mr. Kronenberger Concerning Their
               "Litigation Strategy" And "Claims Against Ms. Polgar" To
15              Third Parties .............................................................................................17

16          E.  No Privilege Attaches To Any Communications Which Took
               Place Prior To November 4, 2007 ..............................................................20
17
            F.  The USCF Has No Right To Withhold Communications
18              Concerning Ms. Polgar's Or Other Board Members' Requests
               For Indemnification, And By Repeatedly Invoking Their
19              Counsel's "Opinion" And/Or "Advice," Plaintiffs Waived Any
               Attorney-Client Privilege To Communications Concerning Ms.
20              Polgar's Request For Indemnication ...........................................................20

21          G.  Plaintiffs Cannot Assert Privilege To Conceal Their Acts Of
               Fraud........................................................................................................23
22
       V.   CONCLUSION..................................................................................................25

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

## CASES

Page

3

*Aronson v. McKesson HBOC, Inc.*
4 2005 WL 934331 (N.D. Cal. March 31, 2005) ...........................................................11, 17

5 *Bowles v. National Ass'n of Home Builders*
224 F.R.D. 246 (D.D.C. 2004)..................................................................................16

6 *Bryant v. Mattel, Inc.*
573 F. Supp. 1254 (C.D. Cal. 2007) ...........................................................................19
7

*Bryant v. Mattel, Inc.*
8 2007 WL 5430887 (C.D. Cal. June 20, 2007) ..............................................................19

9 *Castano v. American Tobacco Co.*
896 F.Supp. 590 (E.D. La. 1995)...............................................................................13

10 *Cavallaro v. United States*
284 F.3d 236 (1st Cir. 2002) ...............................................................................18, 19
11

*Chevron Corp. v. Pennzoil Co.*
12 974 F.2d 1156 (9th Cir. 1992) .................................................................................21

13 *City of Rialto v. United States Dept' of Def.*
492 F. Supp. 2d 1193 (C.D. Cal. 2007)......................................................................10
14

*Clarke v. American Commerce Nat'l Bank*
947 F.2d 127 (9th Cir. 1992) ..................................................................................10
15

16 *Fox v. California Sierra Financial Services*
120 F.R.D. 520 (N.D. Cal. 1988)..........................................................................12, 13

17 *Garfinkle v. Arcata Nat'l Corp.*
64 F.R.D. 6888 (S.D.N.Y. 1974) ...........................................................................21, 22
18

*Handgards, Inc. v. Johnson & Johnson*
19 413 F.Supp. 926 (N.D. Cal. 1976) ............................................................................21

20 *IGT v. Alliance Gaming Corp.*
2007 WL 2429147 (D. Nev. Aug. 20, 2007) ................................................................13

21 *In re Application to Enforce Admin. Subpoenas of SEC v. Nicita*
2008 U.S. Dist. LEXIS 3353 (S.D. Cal. Jan. 16, 2008).................................................18, 19
22

*In re Grand Jury (Impounded)*
23 138 F.3d 978 (3rd Cir. 1998) .............................................................................15, 16

24 *In re Grand Jury Investigation of Ocean Transportation*
604 F.2d 672 (D.C. Cir, 1981) .................................................................................14
25

*In re Imperial Corp. of America*
167 F.R.D. 447 (S.D. Cal. 1995) ...............................................................................19
26

27 *In re Nat'l Mortg. Equity Corp.*
116 F.R.D. 297 (C.D. Cal. 1987)...............................................................................22

28 *In re Sealed Case*
244 U.S. App. D.C. 11,, 754 F.2d 395 (D.C. Cir. 1985) ...................................................22

ii

# TABLE OF AUTHORITIES

## CASES (Continued)

Page

*Knudsen v. City of Tacoma*
  2008 WL 1805665 (W.D. Wash. Apr. 21, 2008)..................................................15, 16

*Permian Corp. v. United States*
  665 F.2d 1214 (D.C. 1981)..................................................................................12, 14

*Phoenix Solutions, Inc. v. Wells Fargo Bank, N.A.*
  254 F.R.D. 568 (N.D. Cal. 2008)..................................................................11, 14, 17

*S.E.C. v. Nicita*
  2008 WL 170010 (S.D. Cal. January 16, 2008)...............................................19, 20

*Sloan v. Truong*
  574 F.Supp. 2d 823 (S.D.N.Y. 2008).....................................................................3, 5

*SNK Corp. v. American v. Atlus Dream Entertainment Co. Ltd,*
  188 F.R.D. 566 (N.D. Cal. 1999)..............................................................................21

*Tennenbaum v. Deloitte & Touche*
  77 F.3d 337 (9th Cir. 1996)......................................................................................21

*Underwater Storage, Inc. v. United States Rubber Co. Services*
  314 F.Supp. 546 (D.D.C. 1970)................................................................................13

*United States v. Bay State Ambulance and Hosp. Rental Service, Inc.*
  874 F.2d 20 (1st Cir. 1989).......................................................................................19

*United States v. Rockwell Int'l*
  897 F.2d 1255 (3d Cir. 1990)....................................................................................18

*United States v. Ortland*
  109 F.3d 539 (9th Cir. 1997).....................................................................................21

*U.S. v. de la Jara*
  973 F.2d 746 (9th Cir. 1992) ........................................................................12, 14, 16

*U.S. v. Hodge & Zweig*
  548 F.2d 1347 (9th Cir. 1977) ..................................................................................22

*U.S. v. Laurins*
  857 F.2d 529 (9th Cir. 1988) ....................................................................................22

*U.S. v. Zolin*
  491 U.S. 554, 109 S. Ct. 2619, 2626, 105 L. Ed. 2d 4690 (1989)...........................22

*Verigy US, Inc. v. Mayder*
  2008 WL 5063873 (N.D. Cal. Nov. 21, 2008) .........................................................19

*Weil v. Investment/Indicators, Research & Management*
  647 F.2d 18 (9th Cir. 1981) ....................................................................10, 11, 17, 21

*Wichita Land & Cattle CO. v. American Federation Bank, F.S.B.*
  148 F.R.D. 456 (D.D.C. 1992)..................................................................................13

iii

1

## STATUTES AND AUTHORITIES

2

**Page**

3   California Civil Code § 1709..................................................................................22

4   California Civil Code § 1710..................................................................................22

5

## MISCELLANEOUS

6

8 J. Wigmore, *Evidence* § 2327, at 636 (McNaughton rev.1961))...............................21

7   5 Witkin, Summary of California Law, § 767, pp.1115-1117,Tenth Ed., 2005 ...........22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

# I.    INTRODUCTION

During the August 10, 2009 hearing, the Court requested that the parties address plaintiffs' contention that certain emails and communications—many of which have been disclosed to the public and/or third parties since September of 2008 for over six months—are subject to the attorney-client privilege.  This memorandum addresses the three categories of communications at issue, and demonstrates that for each, no privilege exists.[1]

*First,* Plaintiffs waived any attorney-client privilege protection of a number of its communications with Karl Kronenberger concerning their claims against Susan Polgar in several ways, including:

(i)     allowing their communications with Kronenberger to be filed publicly in the Texas litigation for ten months without any request to file them under seal or any remove them from the public record in any way (Leigh Decl. Ex. A (*Polgar v. United States Chess Federation Inc.*, Case No. 5:08-cv-00169-C (N.D. Tex, Docket No. 8, dated September 8, 2008));[2]

(ii)    *actually producing copies of these communications* to Defendant Polgar in the Texas litigation in April 2009;

(iii)   allowing the general public and Polgar to have access to these publicly available emails since January 2008 without seeking judicial intervention to achieve their return and/or destruction after Polgar alerted the USCF to their existence on the internet, repeatedly confirmed to USCF that she had retained copies of them, and actually produced them to the USCF in May 2009;

---

[1] This memorandum is supported by the Declaration of Whitney Leigh and Susan Polgar.  None of these declarations' facts or exhibits are new or were not known previously to Plaintiffs; rather, they were each made or referenced in a number of pleadings and declarations leading up to this motion, including, *inter alia,* Polgar's motion for summary judgment, motion to disqualify, and administrative motion to reset the hearing dates on these motions.

[2] *See* Kronenberger Decl. ISO Obj. To Ev. Re: MSJ & Disqualify Mot. At 1 fn 1 (citing Docket No. 163 – dated July 14, 2009—as its "objection" in support of its motion for summary judgment).

1   (iv)   sharing numerous purportedly confidential communications with several third parties

2         who were not members of the Executive Board or the Executive Board's "investigatory

3         subcommittee," as the USCF admitted in its privilege log in the Texas litigation.

4   Under well-established law, any of these actions would *alone* constitute a waiver of the attorney-

5   client privilege for these specific communications and other communications relating to their

6   subject matter.  Taken together, they overwhelmingly demonstrate waiver.

7         *Second,* the USCF waived any attorney-client privilege to communications between it

8   and its counsel concerning Ms. Polgar's request for indemnification[3] when its counsel in this

9   case disclosed and relied on the "opinion" of the federation's litigation counsel in the related

10  Illinois action that Ms. Polgar's request was premature and, thus, that the federation did not have

11  to honor it.  The law against such "selective waiver" is well established:  it constitutes a

12  voluntary waiver of all ostensibly privileged communications between the USCF and its counsel

13  concerning the merits of any indemnification request, by Ms. Polgar or any other party, in this

14  and the related cases.

15        *Third,* the USCF has no claim of attorney-client privilege against Ms. Polgar with respect

16  to communications between the USCF and its counsel before November 4, 2007, when the

17  USCF entered Resolution RB 08-022 and created an investigatory subcommittee that excluded

18  Ms. Polgar (as well as Paul Truong and Bill Hall, the federation's Executive Director).  *See*

19  Docket No. 97 (4/27/09 Decl. of Bill Hall in Response to Civil minute Order ("4/27/09 Hall

20  Decl."), Ex. A.  The UCSF's bylaws specifically provide that Ms. Polgar (and all board

21  members) have the right to review all communications with the federation's counsel.  4/27/09

22  Hall Decl., Ex. G at pp. 26-33 ("Bylaws"), Art. VI, § 3; see also *id.* at pp. 33-40 (Delegate

23  Actions of Continuing Interest ("Delegate Actions")), Delegate Actions 27(1)(b), (c) and (e).

24  There can be little dispute that prior to the formation of the "board subcommittee," under the

25  _____

26  [3] This category of communications overlaps with the first, because it likely includes
    communications between USCF board members and Karl Kronenberger, as well as USCF's
27  communications with its Illinois attorney.

28

1  UCSF's bylaws, no privilege that would exclude Ms. Polgar existed.  For these reasons, the

2  Court should order that the communications listed on plaintiffs' privilege logs be disclosed.

3  **II.      FACTS AND RELEVANT PROCEDURAL HISTORY**

4        The following facts are pertinent to the present motion.[4]  In 2007, the United States

5  Chess Federation's members elected Susan Polgar and her husband, Paul Truong, to the

6  federation's Executive Board.

7        The Executive Board's powers and authority are delimited by the federation's bylaws.[5]

8  Notably, the bylaws expressly establish the right of every Executive Board member to receive all

9  pertinent information regarding matters before the Executive Board, and preclude Executive

10  Board members and federation officers from withholding full and accurate information relevant

11  to federation policy from other Board members.  Bylaws, Art. VI, § 3; Delegate Actions, 27.

12        In October 2007, Brian Mottershead, an administrator of the USCF's online forums,

13  alleged in a purportedly confidential report that Truong had impersonated Sam Sloan, a former

14  USCF Executive Board member, in hundreds of internet postings.[6]  Mottershead made no

15  accusation against Polgar.

16        In October 2007 the Executive Board voted to retain Kronenberger Burgoyne LLP to

17  investigate Mottershead's allegations against Truong.  *See* Polgar's Motion for Summary

18  Judgment [Docket Entry No. 117, at p. 5].  Polgar and Truong were granted the opportunity, as

19  USCF Executive Board members, to vote on that retention. *Id.* Kronenberger was retained to

20  represent the USCF.[7]  *Id.*

21  _____

22  [4] Polgar does not restate herein the general historical facts more fully set forth in her motions for
    summary judgment and her motion to disqualify, currently pending before the Court.  Where
23  appropriate, Polgar will specifically reference those briefs.
    [5] *See* Docket No. 112 (Polgar's Motion to Disqualify) at 2-5; Docket No. 117 (Polgar's Motion
24  for Summary Judgment) at 3-5.
    [6] Sloan's *pro se* lawsuit against the USCF, several of its past and present board members,
25  "supporters and sycophants" of Polgar, and "The United States of America," was eventually
    dismissed with prejudice and costs. *Sloan v. Truong*, 574 F. Supp. 2d 823, 825-31 (S.D.N.Y.
26  2008).
    [7] USCF President Bill Hall has falsely attested that Kronenberger Burgoyne was retained to
27  represent a Board Subcommittee formed in November 2007 to investigate the allegations of
    Continued on the next page
28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

1   On November 4, 2007, the Executive Board passed a resolution (RB 08-022) that called

2 for the appointment of "a Board Subcommittee to consider issues related to charges made by B.

3 Mottershead" (hereafter the "investigatory subcommittee") 4/27/09 Hall Decl., Ex. A.

4   The subcommittee investigating Mottershead's allegations was to consist of the five

5 voting USCF Executive Board members other than Polgar and Truong:  Bauer, Berry,

6 Goichberg, Hough, and Joel Channing. 4/27/09 Hall Decl., Ex. A.[8]  USCF President Bill Hall

7 was *not* himself a member of the subcommittee. *See id.*

8   In November 2007 Kronenberger emailed "recommendations" to the investigatory

9 subcommittee in an email he entitled "Next Steps."  Leigh Decl, Ex. E.  Apparently,

10 Kronenberger also sent that email to Hall, though Hall was not a member of that group.

11 Kronenberger recommended that he "draft a letter to Truong, cc'ing Polgar," explaining, *inter*

12 *alia*, that the USCF's investigation was ongoing, and requesting certain information from

13 Truong. *Id.*  But within the same email in which Kronenberger noted that he would represent to

14 Truong that the "USCF cannot draw any conclusions until such time as it has finished its

15 investigation," Kronenberger recommended that he take steps to persuade the USCF's insurer

16 not to extend coverage to Truong or Polgar (whom Mottershead had not accused of wrongdoing)

17 for Sloan's claims against them in the S.D.NY.  Kronenberger explained that denying Polgar and

18 Truong coverage could impair their ability to defend themselves from Sloan's claims:

> 19 To put additional pressure on Truong and Polgar, I would like to contact the
> insurer, Chubb, and argue that they should not extend coverage to Truong and
> 20 Polgar because the complaint does not allege that their wrongdoing arises from
> their status as directors and because Truong and Polgar both deny that they played
> 21 any part in the postings.  If Chubb does not cover them, then USCF benefits from
> Truong and Polgar hiring potentially lower quality (less expensive) counsel. *Id.*

---

25 Continued from the previous page

26 Brian Mottorshead. *See* 4/27/09 Hall Dec., ¶ 14.  But, as set forth below, that subcommittee did
not exist at the time Kronenberger was retained to represent the USCF by the Executive Board.

27 [8] Channing resigned in April 2008, leaving the investigatory subcommittee with four members. *Id.*, ¶ 6.

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

1    Kronenberger also noted that he, and the Executive Board members with whom he was in

2    contact, had in fact assumed a position adverse to Truong weeks earlier: "As we discussed in our

3    conference call a few weeks ago, we want to put Truong in a position where he has an incentive

4    to resign from the board, and indeed does resign from the board." *Id.* Within this email,

5    Kronenberger further outlined his plan to time his letter to Truong (copied to Polgar) so that

6    Truong and Polgar received it at the same time they learned that the USCF's insurer would not

7    provide them with a defense to the Sloan lawsuit:

8         Truong and Polgar would get this letter on the same day or a day after they
          receive notice that Chubb has terminated them as a client. When they present my
9         letter to new counsel appointed by Chubb, or when they present my letter to their
          other counsel, I suspect that their counsel would advise Truong to consider
10        resignation form the Board, to avoid further allegations of breaches of his
          fiduciary duties.
11
     Leigh Decl., Ex. E.[9]
12
           The conspiracy between Kronenberger, the investigatory subcommittee members, and
13
     Hall, met with initial success. On November 29, 2007 Kronenberger sent his letter to Truong –
14
     which tracked the language he proposed in his "Next Steps" email to the committee. Leigh
15
     Decl., Ex. Q. Polgar and Truong responded by providing Kronenberger with information in
16
     response to his inquiries. Leigh Decl., Ex. R. On November 27, 2007, Polgar received notice
17
     from Chubb that Chubb would not provide Polgar and Truong a defense. Leigh Decl., Ex. S.
18
     But because Polgar and Truong received notice of the termination of their defense just before the
19
     deadline for the filing of their response to Sloan's complaint, Chubb reversed course, and agreed
20
     at the eleventh hour that its attorneys would file a motion to dismiss on behalf of Polgar and
21
     Truong. Leigh Decl., Ex. Y. That motion was granted. *Sloan v. Truong*, 574 F. Supp. 2d 823,
22
     825-31 (S.D.N.Y. 2008).
23

24

25   _____

     [9] In another email to members of the subcommittee sent during the same time period,
26   Kronenberger suggested that rumors his office had "received" regarding allegations of child
     abuse raised against Truong might be of use to the subcommittee members in forcing Truong's
27   resignation from the Executive Board. Leigh Decl., Ex. C.

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

1    Polgar first got wind of the plot between Kronenberger and the subcommittee members in

2   late 2007, when excerpts of Kronenberger's email appeared on the internet. Polgar Decl., ¶

3   Polgar had nothing to do with their disclosure, and has so attested under oath in this case and at

4   length during her two-day deposition in the related Texas litigation.  Leigh Decl, Ex. O.  Instead,

5   she testified that she periodically visits certain chess-related discussion boards on the internet,

6   and also receives Google alerts when postings that related to her appear online.  *Id.*  Polgar was

7   stunned when she discovered the email excerpts, which suggested that her fellow Board

8   members had apparently approved Kronenberger's plans to deny her a litigation defense in a case

9   concerning allegations against her husband that Kronenberger still professed to be investigating,

10   and which contained no claim of wrongdoing on her part whatsoever.  Polgar was further

11   stunned that the investigatory subcommittee, whose sole authority was to investigate

12   Mottorshead's allegations, had colluded with Hall and Kronenberger to take this action

13   surreptitiously, in direct violation of the federation's bylaws.  Polgar Decl., ¶6.

14    Polgar promptly confronted Kronenberger, the subcommittee members, and Hall with the

15   email excerpts.  Leigh Decl., Ex. O and R.  Neither Kronenberger nor the subcommittee

16   members addressed the evidence of their flagrant fraud and misconduct.  Nor, however, did they

17   dispute the authenticity of the email excerpts, or ask Polgar to return the email excerpts or to

18   keep the emails confidential. Polgar Decl., ¶7.

19    Instead, months later, and after they received a cease-and-desist letter from Polgar's

20   attorney in Texas, the USCF filed a pretextual "John Doe" lawsuit in San Francisco Superior

21   Court.  *See* Docket No. 53 (Polgar's Motion to Transfer) at 6-14. [10]  The federation then used the

22   _____

23   [10] It's unclear who made the decision to file that case.  In April, Hall entered a declaration stating
    that he directed the filing of the doe action "after confirming with each member of the Board
24   subcommittee."  4/27/09 Hall Decl., ¶ 16.  After Polgar pointed out that at least one member of
    the investigatory subcommittee disputed Hall's testimony (*see* Docket No. 112 at 9 n.11), the
25   USCF reversed course.  Now the federation argued that "the decision of Bill Hall to initiate the
    Doe litigation in June 2008 was made by him alone, against the backdrop of the history of the
26   USCF Executive Director hiring counsel and initiating litigation without prior formal approval of
    the full Executive Board."  *See* Docket No. 132 at 8.  The USCF did not explain why its
27   Executive Director had apparently perjured himself two months earlier.

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

1   "doe action" to "leverage" California's discovery procedures to conduct discovery specifically

2   targeted against Polgar.[11]  Despite the fact that the USCF obtained no evidence during the "doe"

3   discovery period that would link Polgar to any alleged hacking (*see* Docket No. 83 at 3-5), the

4   federation filed an amended complaint naming Polgar, along with Gregory Alexander, as a

5   defendant.  *Id.*

6           On August 7, 2008, Polgar filed a lawsuit in state court in Texas against the USCF, the

7   subcommittee members, Bill Hall, and certain third parties (including Sam Sloan), alleging

8   claims of slander and defamation, civil conspiracy, breach of fiduciary duty, and others.[12]  On

9   August 25, 2008 – more than six months after Polgar confronted Kronenberger with the emails

10  revealing his fraud – Kronenberger sent a letter to Polgar's counsel in the Texas action alleging

11  that Polgar's complaint in the Texas action "integrate[d] information from email correspondence

12  from my firm and our client, USCF, which were obtained improperly and without permission, by

13  a third party," that Kronenberger asserted was protected by the attorney-client communication

14  privilege.   Leigh Decl., Ex. T.  In his letter, Kronenberger did not specify what portions of

15  Polgar's Texas complaint he contended integrated information from the allegedly privileged

16  communications.  *Id.*  Neither did plaintiffs file any motion to strike any language contained in

17  Ms. Polgar's complaint in the Texas action.

18          On September 10, 2008, Sloan answered Polgar's complaint in the Texas case.  Sloan

19  attached to his answer a number of emails between Kronenberger and members of the

20  subcommittee – the same emails Polgar (and, presumably, thousands of others) had viewed on

21  the internet.  Leigh Decl., Ex. A.  These emails were published on the federal courts' Public

22  Access to Court Electronic Records service (PACER), under the docket of the Texas action and

23

24  _____

25  [11] Kronenberger Burgoyne's boasts about their ability to "leverage" discovery procedures to
    conduct discovery against adverse parties "before they are aware of it" (*see* Leigh Decl. Ex. U]

26  have recently been removed from the firm's website.
    [12] The case was later removed to federal court.  *See Polgar v. USCF*, Case No. 5:08-CV-00169-C

27  (N.D. Tex.) ("Texas Action").

28

DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP

1   remain available on that docket. *Id.*[13]

2       On November 7, 2008, Kronenberger sent an email to Polgar's counsel in this case.

3   Leigh Decl., Ex. X.  Kronenberger claimed that he had been hired by the USCF to investigate

4   Polgar and Truong in response to Mottershead's allegations. *Id.*[14]  In that email, Kronenberger

5   repeated his claim that privileged emails had been stolen.  At the time of Kronenberger's email,

6   those communications had been publicly available on the Texas Court's PACER docket for over

7   a month.

8       Ms. Polgar issued document requests to plaintiffs in February 2009.  Leigh Decl., Ex. W.

9   Plaintiffs filed objections to those document requests on April 27, 2009, but produced no

10   documents. *Id.*  To date, plaintiffs have not produced any documents in this action in response to

11   document requests in this case.  Polgar's counsel has written to plaintiffs' counsel regarding their

12   failure to produce documents in response to her document requests. *Id.*, Ex. H.  For three months,

13   plaintiffs have not substantively responded to these meet and confer letters. *Id.*

14       In response to Polgar's document requests in the Texas action, however, the USCF and

15   Kronenberger did produce documents.  Included in that production, without confidentiality

16   designation, were the identical emails between Kronenberger, the subcommittee, and Hall to

17   which plaintiffs now maintain a privilege still attaches. *Id.*  Plaintiffs also turned over two

18   privilege logs in the Texas Action identifying multiple documents responsive to the requests

19   Polgar issued in this action.  Leigh Decl., Exs. I and J ("[Texas] Defendants Privilege Log" and

20   [Texas] Defendants' Partial Privilege Log"], respectively).

21       Polgar's California counsel reviewed those logs and wrote to Kronenberger.  He

22   explained that the privilege log revealed that plaintiffs had improperly asserted privilege as a

23

24   _____

25   [13] Plaintiffs do not appear to have made any attempt to remove those emails from the public
    docket until after Polgar filed her motion to disqualify Kronenberger in this case, nine months

26   later. *See* Texas Action, Docket No. 155 (Kronenberger Motion for Summary Judgment), at 15
    n. 15.  The Court has taken no action in response.

27   [14] As set forth above, this contention was misleading:  Mottershead made no allegations against
    Polgar.

28

1    basis to withhold from Polgar correspondence that was either (1) not subject to any privilege or

2    (2) for which any privilege had been waived. Leigh Decl., Ex. Z. Plaintiffs did not substantively

3    respond to, much less refute Polgar's contentions that the documents on the logs were either not

4    privileged or the subject of a waiver of privilege.

5         In May 2009, Ms. Polgar produced to plaintiffs' counsel copies of each of the "subject

6    emails" in her possession, along with information identifying the internet location from which

7    the emails were obtained. *See* Declaration of G. Whitney Leigh in Support of Objection, *to*

8    *Plaintiffs' Opposition to Her Administrative Motion to Reset Hearings on Motions for Summary*

9    *Judgment and to Disqualify Counsel, Request to Consider Reply Brief re Motion for Summary*

10   *Judgment, and to Schedule Discovery Conference* [Docket Entry No. 168].

11        On November 17, 2008, Polgar's counsel sent a letter to Hall requesting indemnification

12   for Polgar, pursuant to the federation's bylaws, for the expenses Polgar was incurring in this

13   action. *See* Leigh Declaration, Ex. L; *see also* Bylaws, Art. IX, § 12.  In a series of letters from

14   November 19, 2008 through December 2008, Kronenberger stated that all of Polgar's

15   communications regarding indemnification should be directed to him alone. *Id.*  Later, however,

16   Kronenberger acknowledged that "other counsel" would be involved in considering Polgar's

17   requests for indemnification.  Kronenberger refused, however, to identify who that "other

18   counsel" would be. *Id.*

19        At a hearing in this case on April 13, 2009, Polgar's counsel raised the issue of the

20   federation's failure to response to Polgar's requests for indemnification with the Court.  Docket

21   No. 91 at 26:12-27:9.  Kronenberger at first offered his own view of the merits of Polgar's

22   request: "That's why indemnification is so absurd.  She hacks in – she engages in a criminal act

23   and she wants to be indemnified for it.  It's absurd." *Id.* at 27:12-14.  After the Court reminded

24   Kronenberger that an independent counsel would have to make the indemnification

25   determination, Kronenberger retreated: "Your honor, we have Illinois counsel on all these

26   corporate issues.  I'm not involved." *Id.* at 27:17-18.  Kronenberger then disclosed the opinion

27   of the federation's Illinois counsel, and stated that the federation was relying on that opinion to

28

1  deny Polgar's indemnification request: *"The opinion of counsel* – the federation's counsel on

2  corporate issues in Illinois -- this is under Illinois law -- *is that it's premature.* However, it's in

3  their hands." *Id.* at 28:8-11 (emphasis added).

4       Following these representations by Kronenberger to the Court, Polgar's counsel sent

5  letters to the Illinois counsel who Kronenberger identified as being "independent counsel"

6  seeking its opinion and the basis of this alleged opinion. *See* Decl. of M. Springman ISO Mot.

7  To Disqualify Plt.'s Counsel Ex. J, Ex. J (Docket No. 108-3). This counsel wrote back stating:

8       "we have been retained to represent the USCF in the Illinois litigation . . . .
     because of our current representation of the USCF *we are not able to act as an*

9       *independent counsel or otherwise provide an opinion as to the merits of your*
     *client's claims for indemnification to the USCF."*

10  *Id.* Polgar's counsel also sent Kronenberger a letter seeking that opinion and any related

11  communications from plaintiffs, on the ground that the disclosure of the opinion effected a

12  privilege waiver. Leigh Decl., Ex. AA. Plaintiffs did not respond.

13       The refusal of the interested Executive Board members to consider Polgar's requests for

14  indemnification contrasts markedly with their immediate and apparently unrecorded

15  determination to indemnify themselves in this and related actions. The USCF appears to be

16  indemnifying various Executive Board members and other defendants in the Texas litigation

17  whom Polgar has sued in their personal capacity, as well as other entities, like Continental Chess,

18  Inc., a corporation unrelated to the USCF and owned by Goichberg, the USCF's President.

19  Springman Decl. ISO Mot. For S.J., Ex. L. The Executive Board has not entered any resolution

20  approving indemnification of any of those parties, nor were any indemnification requests passed

21  to the Board of Delegates at its most recent annual meeting. *See* 4/27/09 Hall Decl., Ex. G at 9-

22  25.

23

24  **III.   LEGAL STANDARD**

25       Federal common law governs whether and to what extent a privilege exists and has been

26  waived. *See, e.g., City of Rialto v. United States Dept' of Def.*, 492 F. Supp. 2d 1193, 1197 n.3

27  (C.D. Cal. 2007). "As with all evidentiary privileges, the burden of proving that the attorney-

28  client privilege applies rests not with the party contesting the privilege, but with the party

1    asserting it." *Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 25 (9th Cir.

2    1981). The party asserting the privilege has the burden of proving that no waiver occurred. *See*

3    *id.* ("One of the elements that the asserting party must prove is that it has not waived the

4    privilege.").

5         "Because it impedes full and free discovery of the truth, the attorney-client privilege is

6    strictly construed." *Weil*, 647 F.2d at 24. *See also Clarke v. American Commerce Nat'l Bank*,

7    947 F.2d 127, 129 (9th Cir. 1992) (attorney client privilege applied "only when necessary to

8    achieve its limited purposes"); *Aronson v. McKesson HBOC, Inc.*, Re Docket Nos. 1123, 2005

9    WL 934331, at *1 (N.D. Cal. March 31, 2005) ("[T]he [attorney-client] privilege is applied

10   cautiously.").

11   **IV.    ARGUMENT**

12        Plaintiffs waived any attorney-client privilege to their communications with

13   Kronenberger in a number of ways. Each is discussed below.

14        **A.    Plaintiffs Produced Their Communications With Karl Kronenberger To Ms.**
            **Polgar Without Objection Or Reservation.**

15        "[V]oluntary disclosure of the content of a privileged attorney communication constitutes

16   waiver of the privilege as to all other such communications on the same subject." *Weil v.*

17   *Investment/Indicators, Research & Management*, 647 F.2d 18, 25 (9th Cir. 1981). On April 17,

18   2009, Plaintiffs produced to Polgar documents containing copies of communications between the

19   USCF and Kronenberger which appear to have taken place some time in 2007. *See* Leigh Decl.

20   Ex. C. *When they produced these communications, they did not designate them confidential or*

21   *privileged in any way. See id.* Even to this day, they have never sought to designate these

22   documents "confidential," or "privileged," nor requested that Ms. Polgar return these specific

23   documents to them.

24        This is the textbook example of waiver. *See Phoenix Solutions, Inc. v. Wells Fargo Bank,*

25   *N.A.*, 254 F.R.D. 568, 576 (N.D. Cal. 2008) (Patel, J.) (noting that it is "black letter law" that

26   "the voluntary disclosure of the attorney communication constituted a waiver of the privilege as

27   to all other such  communications on the same subject matter."); *Weil*, 647 F.2d at 25 n. 13

28

1   ("When, as here, the privileged communication is voluntarily disclosed without objection by the

2   asserting party's counsel and in the absence of surprise or deception by opposing counsel, it may

3   be unnecessary to look beyond the objective fact of disclosure in ruling on the question of

4   waiver."). Any analysis as to whether privilege remains as to these communications—or "all

5   other communications on the same subject matter" (*Phoenix* Solutions, 254 F.R.D. at 577) may

6   end here.

7        **B.    Plaintiffs Failed To Use "All Reasonable Means" To Protect The**
          **Confidentiality Of Their Communications With Mr. Kronenberger When**
8        **They Allowed Them To Be Available To The Public For Over Ten Months**
          **(And Counting).**
9

10        The same set of communications between Plaintiffs and Kronenberger which Plaintiffs

11   produced to Ms. Polgar in April of 2009 have *also* been available to the public since September

12   8, 2008 on the docket in the Texas Action. *See* Leigh Decl., Ex. A (Answer / Counterclaim filed

13   by Sam Sloan ("Sloan Answer"). It is undisputed that the USCF received a copy of the Sloane

14   Answer when it was filed, and then *did nothing for over ten months to remove these*

15   *communications from the public eye*. *See id.* Ex. B. The USCF only belatedly raised this issue

16   with the court in the Texas action *after* Ms. Polgar filed a motion to disqualify Kronenberger—in

17   a *footnote* to a motion for summary judgment. *See id.* These communications remain available

18   to the public as of the filing of this Memorandum. *See id.*

19        The USCF's absolute failure to seek the removal of these documents from the public

20   domain is also sufficient to waive any claim of privilege as to these documents and the subject

21   matters discussed in them. As the Ninth Circuit in *U.S. v. de la Jara*, 973 F.2d 746 (9th Cir.

22   1992) explains:

23        the attorney-client privilege may be waived by implication, even when the
          disclosure of the privileged material was "inadvertent" or involuntary. When the
          disclosure is involuntary, we will find the privilege preserved if the privilege
24        holder has made efforts "reasonably designed" to protect and preserve the
          privilege. *Conversely, we will deem the privilege to be waived if the privilege*
25        *holder fails to pursue all reasonable means of preserving the confidentiality of the*
          *privileged matter.*
26

27   *U.S. v. de la Jara*, 973 F.2d 746 (9th Cir. 1992) (internal citations omitted) (emphasis added).

28

1    The requirement of "pursue all reasonable means" to preserve the attorney-client

2  privilege stems from the nature and purpose of the privilege:  to protect *confidential*

3  communications in order to facilitate the attorney-client relationship.  Where a party acts

4  inconsistently with "strict" confidence and destroys the confidence of such communications, the

5  privilege is waived.  *See, e.g., Fox v. California Sierra Financial Services*, 120 F.R.D. 520, 527-

6  28 (N.D. Cal. 1988) ("any disclosure inconsistent with maintaining confidentiality waives the

7  attorney-client privilege."); *Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C. Cir.

8  1981) (holding privilege waived, on grounds that "[e]ven after Occidental was specifically

9  informed by Mead that the privileged documents had been submitted, Occidental did not request

10  that they be returned unread.").

11    This is especially true where, as here, the failure to act results in the allegedly

12  confidential privileged communications to remain available to the public for a period of time.

13  Here, Plaintiffs knew that these communications were publicly available.  Yet, they did nothing

14  in that action *for over ten months while these documents remained available to the public*.  This

15  is more than sufficient to constitute waiver.  *See IGT v. Alliance Gaming Corp.*, NO. 204-CV-

16  1676-RCJ-RJJ, 2007 WL 2429147, at *2 (D. Nev. Aug 20, 2007) (holding party that allowed

17  allegedly privileged documents to be publicly available in court filings for months "waived

18  privilege as to the actual documents filed in the Ninth Circuit's public files and the subject matter

19  contained in those documents."); *Fox*, 120 F.R.D. at 527-28 (finding waiver of attorney-client

20  privilege where third party attached copies of attorney-client communications to complaint in

21  California state court which was available to the public and party could not establish that it had

22  taken any steps to prevent the communications from being a part of the "public record").[15]

23  _____

24  [15] *See also Castano v. American Tobacco Co.*, 896 F. Supp. 590 (E.D. La. 1995) (refusing to
    enjoin plaintiffs from using tobacco documents publicly available through the internet); *Wichita*

25  *Land & Cattle Co. v. American Federation Bank, F.S.B.*, 148 F.R.D. 456, 459 (D.D.C. 1992)
    ("Once the document was produced for inspection, it entered the public domain. Its

26  confidentiality was breached thereby destroying the basis for the continued existence of the
    privilege.") (citing *Underwater Storage, Inc. v. United States Rubber Co.*, 314 F. Supp. 546, 549

27  (D.D.C. 1970).

28

1    In *de la Jara,* the government seized a letter that defendant's attorney had written to him.

2    At trial, the letter was admitted, over objection, based on the "crime-fraud" exception to the

3    attorney-client privilege. The court affirmed defendant's conviction on the grounds that

4    defendant waived the attorney-client privilege by failing to take sufficient action prior to trial to

5    preserve it. The court stated:

6    > De la Jara did nothing to recover the letter or protect its confidentiality during the
     > six month interlude between its seizure and introduction into evidence. By

7    > immediately attempting to recover the letter, appellant could have minimized the
     > damage caused by the breach of confidentiality. As a result of his failure to act,

8    > however, he allowed "the mantle of confidentiality which once protected the
     > document [ ]" to be "irretrievably breached," thereby waiving his privilege.

9

10   *de la Jara,* 973 F.2d at 1041 (quoting *Permian Corp. v. United States,* 665 F.2d 1214, 1220

11   (D.C. Cir. 1981) (quoting *In re Grand Jury Investigation of Ocean Transportation,* 604 F.2d 672,

12   675 (D.C. Cir. ), *cert denied,* 444 U.S. 915 (1979)). Here, the Plaintiffs' period of inaction was

13   even longer than that in *de la Jara.* Again, any question of whether waiver occurred as to these

14   communications, and the subject matters discussed in these communications (*see Phoenix*

15   *Solutions, Inc.,* 254 F.R.D. at 577), can end here.

16       **C.**    **Plaintiffs Failed To Use "All Reasonable Means" To Protect The**
     **Confidentiality Of Their Communications With Mr. Kronenberger After**

17   **Polgar Informed Them That These Communications Were Available To The**
     **Public.**

18   It is also undisputed that Plaintiffs have known that the same 2007 communications with

19   Kronenberger which were attached to the Sloane Answer, and which Plaintiffs produced to Ms.

20   Polgar have been available to the public on various internet chat boards and in Ms. Polgar's

21   possession since at least December of 2007. Ms. Polgar and Mr. Truong contacted the plaintiffs

22   and Kronenberger himself in December 2007 to notify them that these communications were in

23   the public domain. *See* Leigh Decl. Exs. R & BB; Polgar Decl. ¶ 7.

24   Plaintiffs waived any claim to privilege as to these communications because they failed

25   to use "all reasonable means" to preserve the confidentiality of these communications. Plaintiffs

26   have offered *no evidence* as to what steps—if any—they took to prevent the posting of these

27   communications. They failed to even request their return from the one person they knew had

28

1   them—Ms. Polgar. *See* Polgar Decl. ¶ 8. Plaintiffs belatedly claimed that because they sent a

2   letter to counsel for Ms. Polgar in July 2009, over six months later referencing unspecified

3   privileged communications, they have preserved the privilege to these communications. *See*

4   Plaintiffs' Objections To Evidence, Docket No. 155, at 4. This is insufficient. Sending a letter

5   to one person six months after learning that they—and the general public—have copies of

6   communications with one's attorney does not retroactively un-waive the privilege.[16]

7        In *In re Grand Jury (Impounded),* 138 F.3d 978 (3rd Cir. 1998), the government, via

8   subpoena, obtained a memorandum from the party's law firm containing a "time line" and

9   discussing the party's contacts with the woman he allegedly kidnapped. When the party's

10  counsel "promptly notified" the government that the file attorney-client communications, the

11  government advised the party's counsel that the documents were not privileged and the

12  government would not return them. The party thereafter waited *three months* before filing a

13  motion to compel the government to return the file. The court of appeals held that the party had

14  waived the privilege because although the party had timely asserted the privilege, he failed to

15  timely move for its return. In so holding, the court stated:

16          The United States was a direct adversary of Capano, and its continued use of the
            documents directly undermined the purpose of the attorney work product
17          privilege of protecting confidential documents prepared in anticipation of
            litigation from a party's adversary. Capano's repeated admonitions to his
18          adversary to return the protected documents did not prevent the continuing harm
            resulting from the disclosure. Judicial enforcement of the privilege was the only
19          remedy that Capano could have obtained which would have foreclosed the United

20  _____

21  [16] Plaintiffs' suggestion that Polgar participated in a scheme to hack into a USCF Executive
    Board members email account, and that she should be precluded from citing publicly-disclosed
22  communications as a result, is scurrilous and entirely unsubstantiated. Polgar has testified
    repeatedly under oath that she had nothing to do with any email hacking. *See, e.g.,* Docket No.
23  81 (Declaration of Susan Polgar ISO Reply re Motion to Transfer), ¶ 2. Polgar has fully
    explained the circumstances surrounding her request to Alexander to check *public* postings on
24  the USCF's forum. *See id.,* ¶¶ 2-12. Most recently, Polgar testified over two days in the related
    Texas case as to how and when she viewed the publicly-disclosed emails; the transcript of that
25  deposition is now available. *See* Leigh Decl., Ex. O. Yet plaintiffs proceed as if none of this
    testimony exists. They offer no evidence in support of these allegations because none exists.
26  Neither Alexander, nor Polgar, nor any other party has ever offered any testimony or evidence
    linking Polgar to any alleged theft. Alexander's indictment is not proof of his own guilt; it
27  certainly has nothing to do with Polgar's liability in this case.

28

1   States from further use of the seized file. Without such judicial vindication, the
2   United States was free to continue to utilize the documents, thereby negating their
    confidential character.

3   *In re Grand Jury (Impounded)*, 138 F.2d at 537.

4   Similarly, in *Knudsen v. City of Tacoma*, NO. C04-5850BHS, 2008 WL 1805665, at *2

5   (W.D. Wash. Apr 21, 2008), the city defendant inadvertently produced documents which were

6   thereafter posted online by a newspaper. As here, the opposing party specifically notified the

7   city's attorney of this production and the online postings. The city, however, did nothing except

8   send a letter to the opposing party contending that it did not waive its attorney-client privilege.

9   The court held that the city had waived the attorney-client privilege, on the grounds that other

10  than simply sending such a letter was insufficient. "The Court cannot hold that documents

11  available in the public domain and not subject to any apparent efforts to maintain confidentiality

12  are subject to the attorney-client privilege." *Id.*

13  Similarly, in *Bowles v. National Ass'n of Home Builders*, 224 F.R.D. 246 (D.D.C. 2004),

14  the plaintiff acquired possession of defendant's privileged documents while employed as its

15  president. Upon being terminated, plaintiff took the privileged documents with her and refused to

16  return them upon being requested to do so by defendant. Defendant thereafter waited

17  approximately one year into the litigation before filing a motion for return of the documents.

18  Citing *de la Jara* and *In re Grand Jury (Impounded),* the court held that defendant failed to take

19  timely action to enforce its privilege. In so holding, the court stated:

20      ... NAHB knew that an existing adversary already had possession of the
        documents. Indeed, NAHB was on notice that plaintiff was using the documents
21      against her in these very proceedings. The harm to NAHB from this possession
        was immediate. Taking steps to prevent the "further disclosure" of the documents
22      would do not good here; the disclosure had already breached the confidentiality in
        the documents in every way that mattered insofar as an opposing party had
23      possession of the documents and was using them in litigation. At this point,
        NAHB had a clear obligation to "move expeditiously for relief" by taking "legal
24      measures" to preserve its privilege in the documents. (citation omitted).
25
    *Bowles,* 224 F.R.D. at 255.
26
27  Here, as in these cases, Plaintiffs were on direct notice that Ms. Polgar had found their

28  communications with Kronenberger online since December of 2007, yet, as their "Objection"

1  makes clear, they failed to act until August of 2008, when they sent a general letter alleging that

2  certain documents remained privileged. *See* Kronenberger Decl. ISO Objection, Docket No.

3  156, Ex. 1. As the above cases make clear, this is woefully insufficient. Accordingly, Plaintiffs

4  waived any attorney-client privilege to these specific communications and any other

5  communications concerning the same subject matter (*see Phoenix Solutions, Inc.*, 254 F.R.D. at

6  577).

7        D.    **Plaintiffs Have Admitted To Repeatedly Disclosing Their Communications**
                  **With Mr. Kronenberger Concerning Their "Litigation Strategy" And**

8                    **"Claims Against Ms. Polgar" To Third Parties.**

9        The privilege logs Plaintiffs recently produced in the Texas Action demonstrate that they

10  have repeatedly and voluntarily discussed their "litigation strategy" and Mr. Kronenberger's

11  advice with third parties both prior to and after the formation of the "investigatory

12  subcommittee." *See* Leigh Decl. Exs. I and J. This investigatory subcommittee consisted of the

13  five voting USCF Executive Board members other than Ms. Polgar and Mr. Truong: Bauer,

14  Berry, Goichberg, Hough, and Joel Channing. *See* 4/27/09 Hall Decl. Ex. A.

15        The privilege logs make clear that the USCF and Kronenberger *repeatedly* shared their

16  attorney-client communications with third parties, including Brian Mottershead, Brian Lafferty

17  and Jerry Hanken, with whom Kronenberger and one or more the Board Subcommittee members

18  discussed "litigation strategy" or "Plaintiff's claims". *See* Leigh Decl. Exs. I and J. This is the

19  USCF's own admission.

20        Such disclosure waives the privilege as to both those communications and the subject

21  matter of those communications. It is axiomatic that the voluntary disclosure of attorney-client

22  communications with third parties waives the privilege. *See, e.g., Wiel*, 647 F.2d at 25 n. 13;

23  *Phoenix Solutions, Inc.*, 154 F.R.D. at 576 ("black letter law" that "the voluntary disclosure of

24  the attorney communication constituted a waiver of the privilege as to all other such

25  communications on the same subject matter."); *Aronson v. McKesson HBOC, Inc.*, Nos. 1123,

26  1125, 1127, 1136, 2005 WL 934331, at *1 (N.D. Cal. March 31, 2005) (holding communications

27  with third parties were not protected by the attorney-client privilege when made "because

28

1   McKesson had clearly agreed to disclose attorney-client communications to third parties before

2   the communications had occurred."); *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d

3   Cir. 1990) ("The attorney-client privilege does not apply to communications that are intended to

4   be disclosed to third parties or that in fact are so disclosed."). Here, Plaintiffs have *admitted* to

5   such disclosure.

6       Plaintiffs' sole response to Ms. Polgar's correspondence identifying the multiple

7   categories of documents that she contended were improperly withheld on the grounds of

8   unspecified assertions of privilege consists of a summary assertion that the USCF was a party to

9   some sort of "joint defense agreement":

10      Regarding your objection to entries in the privilege logs regarding
        communications with non-USCF parties, I must inform you that the USCF is a
11      party to a joint defense agreement regarding all of these materials, and such
        agreement prohibits the disclosure of the communications listed on the privilege
12      log.

13  Kronenberger Decl. ISO Objection, Docket No. 156, Ex. 1. *See also id.*, Ex. Z (Letter from

14  Leigh to Kronenberger dated June 5, 2009, explaining why documents listed on plaintiffs'

15  privilege were not privileged, and why any privilege that could have obtained to the documents

16  had been waived for multiple reasons).

17      Plaintiffs' summary assertion of the existence of a joint defense agreement fails for at

18  least three independent reasons.[17]

19      *First,* plaintiffs have failed to establish *any* of the elements necessary for the joint defense

20  privilege to apply. A joint defense agreement is "'not an independent basis for privilege, but an

21  exception to the general rule that the attorney-client privilege is waived when privileged

22  information is disclosed to a third party.'" *In re Application to Enforce Admin. Subpoenas of*

23  *SEC v. Nicita*, 2008 U.S. Dist. LEXIS 3353, at *7-8 (S.D. Cal. Jan. 16, 2008) (quoting *Cavallaro*

24  *v. United States*, 284 F.3d 236, 250 (1st Cir. 2002). To rely on the joint-defense privilege, a

25  _____

26  [17] It goes without saying that plaintiffs' claim to a "joint defense agreement" does not constitute
    a response to the multiple other issues raised in Polgar's correspondence regarding the privilege
27  log.

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

1   party must establish three elements: "(1) [T]he communications were made in the course of a

2   joint defense effort,[18] (2) the statements were designed to further the effort, and (3) the privilege

3   has not been waived." *Nicita*, 2008 U.S. Dist. LEXIS 3353, at *7-8. The party asserting the

4   privilege due to a joint defense agreement existed and prevented waiver. *In re Imperial Corp. of*

5   *America*, 167 F.R.D. 447, 455 (S.D. Cal. 1995). Plaintiffs' privilege log and their "objections"

6   filed on July 24, 2009 are devoid of any facts establishing these elements. They do not meet

7   their burden in the slightest. *See Bryant v. Mattel, Inc.*, No. CV 04-09049 SGLRNBX, CV 04-

8   09059, CV 05-2727, 2007 WL 5430887, at *2 (C.D. Cal., June 20, 2007) ("As the party

9   withholding the documents, Bryant was required to substantiate the claim of privilege . . . . That

10  Bryant and MGA are parties to a joint defense agreement does not excuse Bryant from

11  substantiating the underlying claim of attorney-client privilege.").

12      *Second*, the joint defense privilege protects communications between an individual and

13  an *attorney* for another when the communications are 'part of an on-going and joint effort to set

14  up a common defense strategy.'" *Bryant v. Mattel*, 573 F. Supp. 2d 1254, 1274-1275 (C.D. Cal.

15  2007) (quoting *United States v. Bay State Ambulance and Hosp. Rental Service, Inc.*, 874 F.2d

16  20, 28 (1st Cir. 1989); *S.E.C. v. Nicita*, No. CIV 07CV0772WQHAJB, 2008 WL 170010, at *3

17  (S.D. Cal. January 16, 2008) (holding joint defense agreement did not apply to communications

18  between counsel and individuals after individuals retained their own counsel). Here, plaintiffs'

19  privilege log lists multiple communications between members of the investigatory subcommittee

20  and President Hall, *who are not attorneys*. *See*, e.g., Leigh Decl., Ex. I (Defendants' Privilege

21  _____

22  [18] A joint commercial interest in the outcome of a litigation is insufficient to create a joint
    defense agreement or a "common interest" sufficient to prevent waiver. *See, e.g., Verigy US,*

23  *Inc. v. Mayder*, No. C07-04330 RMW (HRL), 2008 WL 5063873, at *1-3 (N.D. Cal. Nov. 21,
    2008) (mere "commercial interest," "joint business strategy," or "a shared desire to see a party

24  succeed in an action is insufficient to invoke the "common interest" doctrine). Thus, third
    parties who are not co-defendants or co-plaintiffs in a litigation are not part of a "joint defense

25  agreement. *See In re Imperial Corp.*, 167 F.R.D. at 456 (rejecting asserting of joint defense
    agreement between defendant and nonparty insurer, noting "[c]ase law discussing and

26  interpreting the joint defense doctrine discuss the doctrine's applicability to co-parties to a
    litigation sharing confidential communications as part of a joint effort to establish a common

27  defense") (emphasis in original).

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

1 │ Log), p.1.  These communications *are not covered by any alleged joint defense agreement.*

2 │    *Third*, disclosure of attorney-client communications to third parties outside of the joint

3 │ defense agreement waives the privilege.  *See S.E.C. v. Nicita*, 2008 WL 170010, at *4 (holding

4 │ joint defense agreement did not prevent waiver because communications were shared with third

5 │ parties; "[s]ince the Court has found that only AMS, Necita and Leonard were parties to the

6 │ JDA, the sharing of any privileged documents with any other corporate officers or third parties

7 │ would destroy the confidential nature of these documents and they would no longer be

8 │ privileged.").  Plaintiffs' privilege log is rife with third parties who are not even a party to the

9 │ joint defense agreement alleged by plaintiffs.  These communications, too, are not covered by

10 │ any alleged joint defense agreement.

11 │    **E.     No Privilege Attaches To Any Communications Which Took Place Prior To November 4, 2007.**

12 │    The privilege logs also lists communications between Mr. Kronenberger, Plaintiffs, and

13 │ third parties which took place *prior to* the formation of the Investigatory Subcommittee on

14 │ November 4, 2007.  *See* Leigh Decl. Exs. I & J.  There is no basis for the assertion of privilege as

15 │ to these communications.  Under the USCF bylaws, Polgar has a right to these communications.

16 │    **F.     The USCF Has No Right To Withhold Communications Concerning Ms. Polgar's Or Other Board Members' Requests For Indemnification, And By Repeatedly Invoking Their Counsel's "Opinion" And/Or "Advice," Plaintiffs Waived Any Attorney-Client Privilege To Communications Concerning Ms. Polgar's Request For Indemnification.**

19 │    Polgar has repeatedly requested that the USCF provide documents relating to her request

20 │ for indemnification and other board members' requests for indemnification.  In response, USCF

21 │ has refused, claiming privilege.  Polgar has a right to these documents for two, independent

22 │ reasons.

23 │    First, Polgar has never conceded that the federation can assert any privilege as to

24 │ communications regarding her requests for indemnification: as an Executive Board member, she

25 │ has an unqualified right to review any such documents.  No "indemnification" subcommittee has

26 │ ever been created that would prevent her from seeing documents related to her requests, or the

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE Case No. 3:08-cv-05126-MHP**

1  requests of other on the board. The USCF cannot, via unilateral action, simply decide to exclude

2  her from access to such documents.

3      Second, even if the federation could assert such a privilege, the privilege is now waived.

4  The USCF has invoked its counsel's "opinions" and "advice" as a reason for delaying (and, in

5  effect denying) her requests for indemnification. *See, e.g.,* Docket No. 91 at 27-28 ("Your

6  honor, we have Illinois counsel on all these corporate issues. I'm not involved. . . . *The opinion*

7  *of counsel* – the federation's counsel on corporate issues in Illinois -- this is under Illinois law --

8  *is that it's premature.* However, it's in their hands.") (emphasis added).

9      It is well established that a party cannot selectively invoke its counsel's "advice" or

10 "opinions" in this manner, while simultaneously refusing to disclose other communications

11 pertaining to the same subject. *See, e.g., Wiel,* 647 F.2d at 23; *United States v. Ortland,* 109 F.3d

12 539, 543 (9th Cir. 1997) (quoting *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir.

13 1992)). In such cases, the party uses the privilege as a "sword" to attack the case against him

14 and as a "shield" to prevent the disclosure of communications that might undermine the advice

15 of counsel defense. *Id.* This tactic is impermissible because it denies the opposing party an

16 opportunity to view "the very information [it] must refute." *Chevron,* 974 F.2d at 1162. *See*

17 *also Tennenbaum v. Deloitte & Touche,* 77 F.3d 337, 340 (9th Cir. 1996) (holding selective

18 waiver impermissible in order to "protect against the unfairness that would result from a

19 privilege holder selectively disclosing privileged communications to an adversary, revealing

20 those that support the cause while claiming the shelter of the privilege to avoid disclosing those

21 that are less favorable.") (citing 8 J. Wigmore, *Evidence* § 2327, at 636 (McNaughton rev.1961)).

22     In *Weil,* the court addressed a statement made during a deposition by an officer of the

23 defendant that he had been advised to take certain actions by his attorney. 647 F.2d at 23.

24 Courts in other cases have repeatedly held that a party cannot invoke its counsel's advice

25 selectively. *See, e.g., Garfinkle v. Arcata Nat'l Corp.,* 64 F.R.D. 688, 689 (S.D.N.Y. 1974)

26 (finding that defendant clearly injected an opinion letter into the case as a relevant matter such

27

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**

1   that, "plaintiff is entitled to probe into the circumstances surrounding the issuance of the letter.

2   He cannot be limited to the letter itself-the finished product.").[19]

3       Here, the USCF has engaged in the same conduct: it has asserted its counsel's "opinion"

4   concerning Polgar's requests for indemnification, in order to imply that these requests lack merit,

5   or are (or were) otherwise denied in good faith. As in *Garfinkle,* Polgar is entitled to probe the

6   strength of these alleged "opinions." To find no waiver would essentially allow the Plaintiffs to

7   rest on "the letter itself-the [alleged] finished product." *Garfinkle,* 64 F.R.D. at 689.

8       This would be especially unfair here, given that the "finished product" appears highly

9   suspect. In contrast to the USCF's repeated refusals to indemnify Polgar in direct violation of

10   the USCF bylaws, the USCF appears to be indemnifying *other* board members and other

11   defendants in the Texas Action, as well as other entities, such as Continental Chess, Inc., a

12   corporation unrelated to the USCF and owned by Goichberg, the USCF's President. *See*

13   Declaration of M. Springman ISO Mot. To Disqualify, Ex. L. Moreover, it appears that

14   Plaintiffs' assertions concerning its counsels' "opinions" are far from accurate: Kronenberger's

15   representations to Polgar in 2007 concerning her request for indemnification of the Sloane

16   litigation in New York were, at the least, extremely misleading (*see* Leigh Decl. Ex. D), and his

17   recent statements to the Court that the USCF had retained an "independent" attorney who had

18   issued an "opinion" was directly contradicted weeks later by this very attorney. *See* Decl. of M.

19   Springman ISO Mot. To Disqualify Plt.'s Counsel Ex. J, Ex. J (Docket No. 108-3) ("we have

20   been retained to represent the USCF in the Illinois litigation . . . . because of our current

21   representation of the USCF *we are not able to act as an independent counsel or otherwise*

22   *provide an opinion as to the merits of your client's claims for indemnification to the USCF.*").

23   Plaintiffs should not be allowed to invoke the opinions of their various counsel in court, then

24   

25   [19] *See also SNK Corp. of American v. Atlus Dream Entertainment Co. Ltd.*, 188 F.R.D. 566, 573
(N.D. Cal. 1999) (where party injected issue of reliance on advice of counsel into suit, attorney-
26   client privilege waived); *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 929 (N.D.
Cal. 1976) (deliberate injection of reliance on the advice of counsel into case waived the
27   attorney-client privilege as to communications and documents relating to the advice).

28   

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**
**WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE**
**Case No. 3:08-cv-05126-MHP**

1   claim that they are not qualified to provide such opinions, and then refuse to provide the basis for

2   these opinions and their later determination that they were unqualified to provide them.[20]

3          **G.**    **Plaintiffs Cannot Assert Privilege to Conceal Their Acts of Fraud**

4         The attorney-client privilege does not protect communications that further a future crime

5   or fraud. *U.S. v. Zolin, 491 U.S. 554, 109 S. Ct. 2619, 2626, 105 L. Ed. 2d 469 (1989)*. To

6   invoke the crime-fraud exception, the party seeking disclosure must "make out a prima facie case

7   that the attorney was retained in order to promote intended or continuing criminal or fraudulent

8   activity." *In Re Nat'l Mortg. Equity Corp., 116 F.R.D. 297, 300 (C.D. Cal. 1987)* (quoting *U.S.*

9   *v. Hodge & Zweig, 548 F.2d 1347, 1354 (9th Cir. 1977)*). Next, it must be shown that there is

10  some relationship between the particular communications sought and the illegality. *Laurins, 857*

11  *F.2d at 540* (referring to *In re Sealed Case, 244 U.S. App. D.C. 11, 754 F.2d 395, 399 (D.C. Cir.*

12  *1985)*).

13        California's general fraud statute, California Civil Code Section 1709, provides a cause

14  of action for "fraudulent deceit": [o]ne who willfully deceives another with intent to induce him

15  to alter his position to his injury or risk, is liable for any damage which he thereby suffers. Cal.

16  Civ. Code. § 1709. California Civil Code Section 1710 specifies "deceit", within the meaning of

17  Section 1709, to include: (1) the assertion, as a fact, of that which is not true, by one who does

18  not believe it to be true (intentional misrepresentation); (2) the suppression of a fact, by one who

19  is bound to disclose it, or who gives information of other facts which are likely to mislead for

20  want of communication of that fact (concealment); (3) a promise, made without any intention of

21  performing it (false promise); (4) the suggestion, as  fact, of that which is not true, by one who

22  does not believe it to be true (intentional misrepresentation); and (5) [a]ny other act fitted to

23  deceive. 5 Witkin, Summary of California Law, § 767, pp.1115-1117,Tenth Ed., 2005.

24

25  [20] Nor should Plaintiffs be allowed to hold their counsel out to Polgar and others as an "independent" counsel conducting an "independent" investigation, while scheming with other

26  board members to have her expelled from the Board, cut off from indemnification, and sued, and then allege that their communications with this counsel concerning indemnification should

27  remain privileged. *See* Part G.

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**
**WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE**
**Case No. 3:08-cv-05126-MHP**

1    The record establishes a prima facie case of fraud directly related to the communications

2  listed in the privilege log. In his "Next Steps" email to the investigatory subcommittee members,

3  Kronenberger expressly trumpets his plan to (1) falsely represent to Polgar and Truong –

4  directors of the nonprofit organization he was retained to represent – that he was engaged in an

5  independent investigation on behalf of the federation into allegations of misconduct; and (2)

6  appeal to Polgar and Truong's fiduciary duties as Executive Board members to the organization,

7  as a means to compel their cooperation with his "independent investigation"; while (3)

8  simultaneously conspiring with other Executive Board members to force Truong and Polgar's

9  resignation, based on allegations that Kronenberger professed to still be investigating and which,

10  in any case, were not (and have never been) attributed to Polgar.

11    Plaintiffs' contention that their communications with Kronenberger before he was

12  retained and before the investigatory committee was created is itself further evidence of

13  fraudulent conduct by plaintiffs. Neither Kronenberger nor plaintiffs disclosed, at the time

14  Kronenberger was presented to the board as the attorney who would conduct an "independent"

15  investigation of Mottorshead's allegations, that Kronenberger already had exchanged

16  communications with Executive Board members that would be concealed from Polgar and

17  Truong, in violation of the USCF's bylaws. The fact that prior to his retention Kronenberger had

18  engaged in communications with Executive Board members that plaintiffs seek to conceal from

19  Polgar and Truong is presumptive evidence that Kronenberger was a sham from the beginning.

20  The emails listed in plaintiffs' privilege logs directly relate to this scheme.

21    The record also establishes that plaintiffs filed this case initially as a "doe action"

22  fraudulently, in order to exploit California's "doe discovery" procedures in order to conduct

23  unchecked and unopposed discovery against Polgar and Truong. *See* Polgar's Motion to

24  Transfer, [Docket Entry No. 53]. Plaintiffs then falsely claimed (and represented to the Court)

25  that they named Polgar as a defendant in this action based upon evidence they obtained through

26  "doe discovery". To the extent that the communications listed within the privilege log track the

27  timing of these fraudulent acts and misrepresentations, no privilege obtains.

28

1        Finally, plaintiffs repeatedly falsely attested to this Court that this lawsuit had been

2   authorized by the USCF and, when ordered by this Court to produce proof of their

3   representations, embarked on a plan to create after-the-fact authorization by the USCF.

4   Plaintiffs' communications regarding their efforts to cover up perjurious statements they made to

5   this Court are not privileged.

6   **V.   CONCLUSION**

7        For the reasons set forth above, Ms. Polgar respectfully requests that the Court find that

8   plaintiffs waived any attorney-client privilege to the following categories of documents:

9      (1)   The communications between Plaintiffs and Kronenberger produced by Plaintiffs,

10         attached to the Sloane Answer in the Texas Action, and produced by Polgar in the

11         instant action, and all communications on the same subject matter;

12     (2)   Communications between the Plaintiffs and Kronenberger or other counsel relating to

13         any requests for indemnification considered by the federation in this or the related

14         Texas, New York, or Illinois lawsuits; and

15     (3)   Communications between Plaintiffs and Kronenberger which took place prior to

16         November 4, 2007.

17  Dated: August 17, 2009          GONZALEZ & LEIGH, LLP

18

19                       By:  */s/ G. Whitney Leigh*

20                           G. Whitney Leigh
                             Attorneys for Defendant
                             SUSAN POLGAR

21

22

23

24

25

26

27

28

**DEFENDANT SUSAN POLGAR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
WITHHELD ON AN INVALID ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE
Case No. 3:08-cv-05126-MHP**